No. 28,119.

MRS. EMMA FERGUSON, *Appellant*, v. O. C. LANG, *Appellee.*

(268 Pac. 117.)

Opinion filed June 9, 1928.

*A. L. Oswald* and *John Fontron,* both of Hutchinson, for the appellant.

*J. S. Simmons, Alva L. Fenn* and *Max Wyman,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff sued defendant for damages sustained in a collision of automobiles on a public highway. A demurrer was sustained to her evidence, and she appeals.

The facts were to this effect: There is a paved road in Reno county which runs north and south. A few miles north of Sylvia this road is intersected at right angles by an east and west road. On April 6, 1927, plaintiff and her husband were journeying northward in a touring automobile on this paved road, en route from Los Angeles, Cal., to their home in Peoria, Ill. Plaintiff's husband was driving, and she rode at his side. As they approached the crossroad at about eighteen or twenty miles an hour, the defendant came from the west driving his car at a speed of about forty miles per hour and struck the Ferguson car, wrecking it, and severely injuring the plaintiff.

Plaintiff's husband testified:

"I saw this [defendant's] car to my left. . . .

"And I figured I had plenty of time to cross this road, as I wasn't going more than eighteen or twenty miles an hour. I hadn't been driving at any excessive speed at any time. And just as I saw I was going to get hit, I couldn't help myself, I just cramped on my wheel and held my car as steady as I could.

*Cross-examination:*

"Q. Now, you say you were driving about eighteen or twenty miles an hour when you approached the crossing? A. Yes, sir.

"Q. And you saw Mr. Lang to the west, did you? A. Yes, sir; to my left.

"Q. And you figured you could get across before he got there? A. Well, without any bother. . . .

"Q. You didn't change your speed? A. No, sir. . . .

"Q. Did you give any notice to how rapidly he was approaching you? A. I should judge he was running in the neighborhood of forty miles an hour. . . .

"Q. Did your wife call your attention to how fast he was coming? A. She didn't see him. She was looking the opposite way.

"Q. She could have seen him if she had looked? A. If she had been looking that way she could have seen him. . . .

"Q. You knew, of course, there was a crossroad there? A. Yes, sir; and I always watch them.

"Q. At this time you simply made a mistake as to how fast the fellow was coming? A. That is the idea; yes, sir.

"Q. Did your wife usually watch the roads a little and speak to you about them? A. Yes, sir; she usually did, but she was looking to the right instead of to the left.

"Q. You would listen to her suggestions as to what was coming or what wasn't coming? A. I would whenever she spoke to me. I always paid attention to her."

Plaintiff testified in her own behalf as follows:

"That at the time of the accident she was riding in the front seat with her husband; that she wasn't paying a great deal of attention to the way her husband was driving, but that she thought he was driving all right; that she didn't see the Lang car approaching; . . .

*Cross-examination:*

"Q. Now, you say you didn't see Mr. Lang's car? A. No, sir.

"Q. Which way were you looking at that time? A. Well, I was kind of looking straight ahead of me. . . .

"Q. Did you look to the west or pay any attention to where you were going? A. No, sir; not in particular, I didn't. I was just kind of sighting through—looking straight ahead of me. . . .

"Q. How many roads had you crossed since you left Sylvia, running across the pavement? A. I couldn't tell you that.

"Q. Had you crossed any? As a matter of fact, you hadn't paid any at-

tention to the crossroads, had you? A. I couldn't tell you. I didn't pay any attention to the crossroads. . . .

"Q. But as a general thing you didn't pay any attention to the crossroads? A. Well, not unless I saw rigs coming; and I would say 'Don't drive over there; let them go ahead first.' . . .

"Q. But you didn't see this one? A. No, sir.

"Q. That means, of course, that you didn't look? A. No, sir; I couldn't say that I was looking—thinking about any rig coming on the road."

By the arguments of counsel it would appear that plaintiff was nonsuited in the trial court because of her own negligence and that of her husband, and that she and her husband were engaged in a joint enterprise.

From the testimony quoted above it is obvious that the plaintiff's husband was guilty of negligence. Although he saw the defendant racing towards the crossing at forty miles per hour, he drove ahead at eighteen or twenty miles per hour, on the miscalculation that he could effect a crossing ahead of the speed fiend. This was a plain breach of the statute which provides:

"Upon approaching a railroad crossing or intersection of highways outside of any village or city, or turning corners, the person operating a motor vehicle shall reduce the speed of such vehicle to a rate not exceeding eight miles an hour, and shall not exceed such speed until entirely past such crossing or intersection." (R. S. 8-122, as amended by Laws 1925, ch. 84.)

Passing for the moment the question whether plaintiff and her husband were engaged in a joint enterprise so that his negligent driving might likewise be attributed to her, we are confronted with the question whether plaintiff herself was negligent. By the testimony of plaintiff and her husband, she could have seen the defendant racing towards the intersection at breakneck speed, but she ignored that road crossing. She looked ahead, and to the right, not to the left. She gave no word of caution to her husband to slow down to the speed prescribed by the statute. If she had done so, her husband would have responded to her suggestion. He testified that he always did:

"Q. You would listen to her suggestions as to what was coming or what wasn't coming? A. I would whenever she spoke to me. I always paid attention to her."

It is a rule of law that even a passenger in a vehicle on a public road must exercise ordinary care. And where he has an opportunity to see approaching danger it is his duty to warn the driver and to use his influence to induce the driver to take whatever precautions

are necessary to avoid it. In *Bush v. Railroad Co.*, 62 Kan. 709, 64 Pac. 624, it was said:

"Where one person is riding with another for the mutual pleasure of both, with equal opportunity to see and ability to appreciate the danger, and is in fact looking out for herself, but makes no effort to avoid the danger, she is chargeable with the want of care which results in injury." (Syl. ¶ 3.)

In 29 Cyc. 551 the rule is thus stated:

"Notwithstanding the fact that the negligence of the driver will not be imputed to a passenger, yet it is necessary that the passenger himself must exercise ordinary care. And the rule denying the imputation of the negligence of the driver to the passenger has no application where such passenger has an opportunity to discover the danger, it being his duty in such case to discover and avoid it."

This rule is the one familiarly applied in cases of passengers who are hurt or killed at railroad crossings over public roads by collisions between railroad trains and automobiles driven by negligent chauffeurs (*Fair v. Traction Co.*, 102 Kan. 611, 171 Pac. 649; *Cooper v. Railway Co.*, 117 Kan. 703, 232 Pac. 1024, and citations), and it is not easy to develop a logical rule which would relieve automobile passengers of the duty of exercising due care for their own safety against the possibility of collision with another automobile on the highway. It was plaintiff's duty to look out for herself as far as that was practicable to do so. And she testified she paid no attention to the crossroads, or to this crossroad:

"Q. But as a general thing, you didn't pay any attention to the crossroads? A. Well, not unless I saw rigs coming, and I would say, 'Don't drive over there; let them go ahead first.' . . .

"Q. That means, of course, that you didn't look? A. No, sir; I couldn't say that I was looking—thinking about any rig coming on the road."

This failure to look, failure to see the obvious danger, and to give a word of caution to avert it was contributory negligence on plaintiff's part. She made out a strong case of culpable negligence against the defendant, one for which he is, of course, criminally liable; but under the facts developed by the testimony defendant cannot be subjected to civil damages in behalf of plaintiff.

Appellant suggests that in testing the propriety of a demurrer only the evidence favorable to the party adducing the evidence is to be considered, and any evidence to the contrary is to be ignored. But here we have no contradictory evidence. All the evidence was to one effect—the negligent and excessive speed of defendant, and plaintiff's negligent disregard of the crossroad over which the defendant was approaching; her failure to look and see the manifest

and imminent danger into which her husband was carrying her at eighteen or twenty miles an hour, and her failure to do anything to avoid that danger.

This conclusion renders it needless to consider another point relied on by appellee to sustain the judgment of the trial court— the so-called joint enterprise in which she and her husband were engaged at the time of the collision.

The judgment is affirmed.