No. 33,798

Ethel Carson, *Appellant*, v. The City of Wichita, *Appellee*.

(80 P. 2d 1114)

Opinion filed July 9, 1938.

*Harold H. Malone,* of Wichita, for the appellant.

*Vincent F. Hiebsch, K. W. Pringle* and *Forest V. McCalley,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Dawson, C. J.: Plaintiff brought this action for damages against the city of Wichita for the death of her husband. She charged that the city had knowingly maintained a defective street and premises adjacent thereto, in consequence of which an automobile in which her husband was riding capsized, and he was killed.

As the action was disposed of on the city's demurrer to plaintiff's evidence, the controlling facts must be stated at some length.

And first as to the *locus in quo:*

Some thirty years ago a certain natural watercourse in the northeast part of the city, called Chisholm creek, was inclined to overflow and do damage to neighboring property in rainy weather. To correct that tendency the city condemned a strip of land through the city and dug a canal therein to carry the waters of the creek. The course of the canal was from northwest to southeast. From time to time the city widened and deepened the canal. The land which the city had eventually acquired for a right of way for the canal varied from 250 feet to 300 feet in width. Within the limits of this right of way were the spoil banks of earth dug from the canal. On the east side of the canal, for some considerable distance the crest of the spoil bank had been leveled and a graveled roadway for public travel had been constructed thereon. At intervals along the route of the canal, it was crossed by bridges of certain east-and-west streets. One of these streets was Murdock avenue. The canal bank roadway coming from the northwest ended at Murdock avenue. Traffic coming southward on the canal roadway at that juncture had to turn to the east or west on Murdock avenue. There was, however, no barrier on the south side of Murdock avenue to prevent traffic from straying southward on the east side of the canal right of way. There was a dim trail thereat, which seems to have been made by persons who came to dig sand and haul it away with or without the permission of the city. This sand digging had made a pit several feet deep, about twenty feet in length, at the distance of seventy feet to ninety feet south of the curb line of Murdock avenue.

A short distance south of the pit, a railway right of way crossed the canal, thus making an effective barrier to any further use of the canal right of way as a public road.

On the night of August 25, 1936, an automobile party of six persons, one of whom was Carson, plaintiff's husband, came from Wellington to attend a night ball game in Wichita. Carson was at the wheel. They entered upon the canal roadway and traveled southward towards the ball park, whose electric lights they could see a few blocks away, toward the southeast. When they reached Murdock avenue they proceeded across it towards the south for about 100 feet, when the presence of tall weeds and grass thereabout caused one of the party to remark, "This isn't Hydraulic"—presumably the name of a nearby street they intended to use. Carson stopped the car. About the same time a railway train crossed their direc-

tion a short distance ahead. These facts convinced them they were off the road. Five of the party alighted and changed places. Dean Hale, whose mother owned the car, took the wheel. Carson and three others got in the back seat, and the sixth person sat beside Hale. The car was backed for a short distance, when the ground gave way and the automobile and its occupants tumbled into the pit, and Carson, husband of plaintiff, was killed.

There was no want of evidence to establish the controlling facts of the accident. Exhibits consisting of photographic copies of the plat of that portion of the city, of the canal roadway, of Murdock avenue, of the dim trail south of Murdock avenue into which the automobile party strayed, and of the pit and the grass and weeds thereabout were offered in evidence. The competency of some of these was questioned, but they were all helpful to a general understanding of the *locus in quo*, whether technically admissible or not.

Plaintiff's witness, Garrett, testified:

"When we came to Murdock street we continued south. The road apparently continued on. There was nothing to indicate that it was not the road. We just went across Murdock street and up into that roadway and after we got there a few feet we saw the ball park, and the road got poorer—grass all over it—and we knew we weren't on the right road, and we just went a little bit farther and then we stopped. There was a train coming along about that time. We saw its headlights, and the lights from the ball game were quite a bit brighter from a distance, and we stopped. It kind of blinded our attention right then. We got out and the road looked like it was worse on farther down, and Mr. Hale said, 'Let me have the wheel. It is my mother's car.' I got out on the right side and the canal bank was on that side and we knew that wasn't very safe. I got in the back seat. . . . The way conditions was in front of us it didn't look like it would be best for us to go on, and the lights were really dazzling and it didn't look safe, and as we had got in there, we thought it would be better to back out.

"We didn't know what was ahead and didn't know what we would get into, so we just exchanged places and Mr. Hale started backing out. He backed a little way, and he stopped and kind of leaned out like that and looked around and then he went on farther, and just about that time the back end— we could feel it caving off, and the next thing we knew we were down in that hole. It kind of dazed me. I got hit in the back of the head. Mr. Carson was sitting on the right-hand side of the back seat when we started backing out. I saw him look back as the car progressed backwards. I didn't see any pit and didn't see any pit as we came in there. There was an incline as you came in."

On cross-examination the same witness continued:

"It seemed like when we got up kind of on that incline [which] was where I first observed there were weeds and grass along the tracks there. . . . We

all discovered it wasn't the road . . . then we stopped. The canal bank was right there and it looked dangerous . . . we could see that we were in a dead road. . . . Carson also got out and got back in the back seat. . . . The headlights of the car were on as we were going backwards. . . . As Mr. Hale was backing out he was looking back on the side he was on and along the side of the car. He was naturally looking around like they would. As far as I could see he was looking down to see that his wheels were in the track and he stopped once and I think I said it didn't look like we could back out of there or that it was a pretty dangerous place. When I said that he stopped and opened the door and looked around and went back slower."

### Dean Hale testified for plaintiff:

"I was in the back seat of the car as we crossed Murdock. Then we all noticed something about a dead-end street. It didn't look so good. Someone suggested that we stop and I suggested that I take the wheel and back out. At the place we stopped the road ahead did not appear to be passable as a street. It looked like we could get out the same way we came in, so I backed out a ways, then stopped and sort of leaned out and got outside and saw I was following the tracks and got back in and proceeded very slowly. . . . I stayed in the tracks as far as I know. The car gave way to the one side and just fell, that is all I know."

### On cross-examination he added:

"I don't think the headlights would show more than two or three yards on either side of the car, maybe not that far. . . . I knew nothing whatever about the road. I could see over to the left, just seemed like sort of grass there, then to my notion there was sort of a bank there, several feet to the left. The canal was a short distance to the right. Somebody suggested they would look out the back window and I suggested that we back out. I was looking at my side. I got in the driver's seat and started to back out. I had no flashlight in the car. There were two taillights. The reason I stopped after backing a short distance was that I wanted to make sure I was following the track . . . the taillight gave enough light to see whether or not I was in the track at all times. . . . That taillight would light up a distance of two or three feet to the sides and two or three feet to the rear. I was not backing over two miles per hour. No one was walking back to investigate. I just had my mind set on following the tracks. As to whether or not I was looking back to determine whether there were any banks or ditches like I had noticed on the side, that bank I noticed to the left looked like it ran the same distance to the left all the way back. I just had my mind set on following the tracks. I wasn't looking for any bank or ditches, but was just attempting to follow the track we came in on. At the rate I was traveling someone could have walked along the side or back of the car to view the ground to see whether there was any bank or pit or other defects there. I don't recall that this was even suggested and no one did it."

Defendant's demurrer to the evidence raised several questions of law, including these: That the accident did not occur on any street

or traveled thoroughfare for the safe maintenance of which the city was liable; that the negligence of the driver was the direct and proximate cause of the accident, and that the deceased, being engaged in a joint enterprise with the driver, was likewise guilty of contributory negligence.

In sustaining the demurrer, the trial court said:

"It is shown affirmatively by the plaintiff's evidence that the place where the accident occurred was not a public street or highway or public highway which the city was required to maintain and keep safe for public travel; and no evidence to show that the city ever exercised any control over the place as a public highway or recognized it to be a public street;

. . . . . . . . . . . . . . .

"The court finds as a matter of law that the canal and the right of way of the canal (where the accident happened) is a governmental function and also finds that the city never recognized this highway or its operations of the street or highway. . . . I don't know where the line should be drawn to determine when the court should determine as a matter of law that plaintiff has been guilty of contributory negligence. . . . The supreme court is in as good position to pass on the contributory negligence in this case as this court is. It has exactly the same record."

Plaintiff appeals, assigning various errors. She complains of the exclusion of proffered testimony which would have shown that on the day of the accident truck drivers had been seen hauling sand or dirt from the pit into which the Hale automobile capsized; that the court refused to hear testimony that an exhibited photograph of the scene of the accident was not accurate because people had gathered thereabout and tramped down the grass which had concealed or partly concealed the pit into which the automobile fell. Other rejected offers of evidence related to expenses to which plaintiff was subjected—hospital, doctor, ambulance and funeral bills.

As we proceed with the consideration of this appeal, it will become apparent that no vital question in this lawsuit turns on the exclusion of evidence. Technically, however, the errors assigned under this head are not open to our review, because the rejected testimony was not brought into the record as the code requires. (G. S. 1935, 60-3004; *Robinson v. Sullivan,* 127 Kan. 248, 273 Pac. 461; *Mohr v. Women's Benefit Ass'n,* 134 Kan. 311, 5 P. 2d 789; *Saathoff v. State Highway Comm.,* 146 Kan. 465, 72 P. 2d 74.)

Another minor complaint, which will not be a vital matter in this appeal, relates to the refusal of the trial court to permit plaintiff's petition to be amended to include certain items of damages—funeral bills, medical charges and the like. But the matter of belated

amendments to pleadings is largely vested in the discretion of the trial court, and no abuse of discretion in this instance is made to appear. (*Bank v. Badders*, 96 Kan. 533, 536, 152 Pac. 651; *Long v. Railroad Co.*, 100 Kan. 361, 164 Pac. 175; *Lashbrook v. Sovereign Camp*, 148 Kan. 16, 19, 79 P. 2d 881.)

Appellant marshals authorities which hold that in addition to the liability of a city for injuries caused by defects in its streets it is also liable for injuries caused by dangerous places so close to its streets that travelers may inadvertently stray into them; that a city is liable in damages for injuries sustained through pitfalls and like dangerous places where the city owns the premises or is in possession and control of them. Appellant also contends that the premises where the accident occurred were apparently a continuation of the canal roadway which did exist north of Murdock avenue, and that the city was liable accordingly.

While some of the justices cannot give their assent to these contentions and are inclined to sustain the rulings of the trial court thereon, a majority of the court are in accord on one legal question of controlling importance raised by defendant's demurrer and which the trial court left undecided—the contributory negligence of the occupants of the automobile in proceeding to back out of the place into which they had strayed without lights to see where they were going or taking other precautions to insure their safety. At almost every session of this court we are compelled to deny damages to persons injured in automobile accidents because, however negligent their adversaries in the litigation may have been, they themselves have also been negligent in driving their cars (or riding in them without protest) in situations where they could not see where they were going, and could not be assured that they could proceed with safety. In the recent case of *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903, the plaintiff's action was for damages sustained in a collision with defendant's truck on the highway. The accident occurred when a dust storm so dense was blowing that plaintiff could not see more than three feet ahead of her car, but she drove ahead nevertheless, taking a chance that the road was safe. Such a course constitutes contributory negligence by all the rules of law. Still more so, it is contributory negligence for a motorist to operate a car backwards in a strange location in the nighttime with insufficient lights and without taking other sufficient precautions to be assured that he could safely do so. Under the circumstances in this case

Carson was in duty bound to look out for his own safety. He knew the driver was operating the car in a manner and in a direction where he could not be sure that it was safe to do so. It was Carson's duty to protest, and if necessary to ask that the car be stopped so that he could alight. Indeed, Carson, and all but one of the others, had alighted because they realized they were in a place of danger; but neither Carson nor the others took any precaution to insure their safety, but climbed back into the car and took the chance that their driver would back the car safely out of its dangerous situation. Even where there is no joint enterprise, passengers in an automobile are under a duty to look out for their own safety as far as practicable. (*Sharp v. Sproat,* 111 Kan. 735, 208 Pac. 613; *Naglo v. Jones,* 115 Kan. 140, 222 Pac. 116; *Ewing v. Railroad Co.,* 117 Kan. 200, 206, 231 Pac. 234; *Ferguson v. Lang,* 126 Kan. 273, 268 Pac. 117, and citations; *Blue v. Atchison, T. & S. F. Rly. Co.,* 126 Kan. 635, 270 Pac. 588; *Shrewsbury v. Goodacre,* 135 Kan. 230, 10 P. 2d 1.) In that duty to himself Carson failed, and the judgment denying damages against the city in behalf of his widow contains no material error. It is therefore affirmed.