**GENERAL PORTLAND CEMENT COMPANY, Appellant,**

v.

**Barbara WALKER, Appellee.**
**No. 18422.**

United States Court of Appeals
Fifth Circuit.
July 20, 1961.
Rehearing Denied Aug. 30, 1961.

W. L. Gray, Jr., Robert G. Young, Blackwell, Walker & Gray, Miami, Fla., for appellant.

Earl Faircloth, Neal P. Rutledge, Hector, Faircloth & Rutledge, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The defendant, General Portland Cement Company, appeals from a jury verdict and judgment in a personal injury death action. The complaint alleges that the decedent, Ernest Walker, was drowned when his truck went off the road into a canal because of the defendant's negligence in failing to maintain the road in proper condition or to barricade the road. The defendant's sole contention on appeal is that the trial judge erred in failing to direct a verdict for the defendant on the ground that as a matter of law Walker's contributory negligence was the proximate cause of the accident. We hold that in the circumstances of this case the trial judge properly allowed the jury to decide this issue.

General Portland, a Delaware corporation, manufactures and sells bulk cement. It owns and operates a cement plant in Florida, near Miami. On the plant's premises the dry cement is loaded into large bulk cement trucks and transported throughout southern Florida for sale to General Portland's customers. An independent contractor, Commercial Credit Corporation, owns and operates some of the cement trucks. Commercial Credit employed Ernest Walker as a truck driver. He was a skilled, experienced, professional truck driver.[1] Walker was active, hard-working, healthy, and twenty-two years old at the time of the accident.

December 23, 1958, Walker drove home the truck assigned to him, and waited to receive loading and delivery orders from his employer regarding the truck. The day after Christmas his dispatcher

1. Walker had been driving motor vehicles for a decade, beginning at the age twelve (R. 135). In order to support his mother and crippled father, he stopped high school and went to work for a service station, working with motor vehicles and learning to be a mechanic (R. 133–135). Later he went west and obtained employment driving large trucks in the Oregon mountains (R. 135–136). On returning to Florida, decedent again became employed as a service station attendant and mechanic (R. 139); he then went into the auto wrecking business (R. 140); and about the middle of 1957 he purchased a dump truck and went into the dump truck business (R. 140), while also being employed as a truck driver for the Gerald MacElroy Trucking Company (R. 141). From this he went to his employment with Commercial Carrier Corporation as a truck driver.

called him at home, late in the afternoon, told him to pick up a load of cement at General Portland's plant, and then take the truck to a station to have a leak in the radiator repaired before delivering the cement. General Portland regularly keeps its plant open for the loading of trucks from seven in the morning until twelve at night. As a common practice, drivers load at night. On the night of the accident Walker arrived at the front gate of the plant at 11:50 p. m., just ten minutes before closing time. He proceeded, as instructed, along the North Entrance Road to the packhouse, or loading platform, where he received a truckload of twenty-one tons of dry cement. After the truck was loaded, he pulled out of the packhouse and drove, as instructed, along the South Exit Road, the regular exit. Witnesses said that he appeared calm, unhurried, in complete control of his faculties, and that he pulled out of the packhouse in a normal fashion. That was the last time Walker was seen alive.

In the course of his employment Walker had been in and out of General Portland's plant about six or eight times. He knew that the South Exit Road heads south, straight and level for three hundred feet, then curves eastward and crosses some railroad tracks. Unknown to Walker, but known to General Portland, there was a large dragline at the beginning of this curve, blocking the road and preventing any passage. The dragline had broken down at three o'clock that afternoon. General Portland's employees had abandoned it since they were unable to repair it before quitting time. Not only was is impossible for Walker to get around the dragline, but the road was barely fifteen feet wide, not wide enough to permit a U-turn by a truck fifty feet long and eight feet wide. The guard at the front gate, where the drivers stopped, and the loading foreman in the packhouse, knew the dragline blocked the road but did not warn Walker. An artificial canal, or borrow-pit, dug for General Portland, runs along the west side of the three hundred foot straight stretch on the South Exit Road. The canal is about two hundred to three hundred yards long, twenty-five to thirty feet wide. At the time of the accident it was filled with muddy water fourteen feet deep, with an additional three or four feet of soft mud settlement on the bottom. The canal had no guard rails. The sides were sheer, and there was no support for the bank of the canal.

The South Exit Road is hard-surfaced, unpaved, limerock road. A few days before the accident, however, General Portland dumped Everglades muck, or marl, along the east side of the three hundred foot stretch. Some of the muck fell or was shaken from the dump trucks on the surface of the road causing a large number of slippery spots about three inches thick on the road. The slick spots were dangerous, and the dump truck operator reported the presence of the spots to General Portland. The company dispatched a bulldozer to clean up the muck and make the road safe. The bulldozer became mired in the muck right at the curve. Then, while a dragline was being used to extricate the bulldozer the dragline broke down. Thus, from the curve all the way along the three hundred foot stretch, over which Walker drove and backed up, muck and mire remained on the road. It is therefore clear: (1) General Portland had actual knowledge that the dragline blocked the road and that there were spots of slippery muck on the surface of the road; and (2) Walker, who had not been on the premises for three or four days, had no knowledge regarding either the blocked road or the slippery muck. There were no flares, no barricades, no warning devices of any kind around the dragline or at the entrance to the South Exit Road.

No one saw the accident, but the physical evidence tells rather definitely what happened. The night was fair and cloudless. The moon was out. South of the packhouse, two hundred and fifty to three hundred feet from the scene of the accident, there were two-hundred-watt floodlights mounted fifteen feet high on some of General Portland's silos. Walker left the packhouse shortly after midnight,

and drove along the three hundred feet straight stretch of the South Exit Road, heading toward the curve. As his tracks showed, he stopped when he was about fifty feet from the dragline. Realizing that it was impossible for him to get around the dragline, Walker began to back up his truck, retracing his path. He backed up three truck-lengths, or until he was about ninety feet from the beginning of the road, where he could turn around. At this point twenty feet of the road-bank collapsed and caved in beneath the weight of his truck loaded with twenty-one tons of cement. The cave-in affected not only the bank but cut eight or ten inches of the hard surface of the road. The canal had no protective shelf and no gradual slope; truck and trailer tumbled over the bank into the canal. The truck's trailer did a half somersault, landing upside-down. The tractor jack-knifed in the opposite direction but it too landed upside-down. Walker, trapped in his cab in fourteen feet of muddy water, was drowned.

The truck, with Walker's body wedged inside the cab, was not discovered until the following morning. An autopsy revealed that Walker had eaten a full meal earlier in the evening and that there were no traces of alcohol in his system. He was survived by his widow and two daughters, the youngest of whom was born the day after his funeral.

General Portland contends that Walker was contributorily negligent as a matter of law for deciding to back out of the South Exit Road when he found his way blocked by the dragline. Since Walker had driven his truck over the roadway several times before, the argument runs, he knew or should have known of the existence of the canal bordering the roadway and when he operated his tractor-trailer in reverse gear, at night and under the conditions existing at the time of the accident, he was guilty of contributory negligence as a matter of law.

"Contributory negligence [2] is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection." Prosser, Torts § 51 (2nd ed.). See Restatement of Torts, § 463; James, Contributory Negligence, 62 Yale L.J. 691 (1953). The crux of the problem is the reasonableness of the conduct of the person allegedly at fault. What conduct is "reasonable" varies with the circumstances. The jury, therefore, must decide whether the conduct complies with the standard of reasonable care. A trial judge takes the decision away from the jury when reasonable men cannot differ—then and then only.

General Portland relies on the Florida rule that when a person walks in the dark and is injured by a condition which he knew existed he is guilty of contributory negligence as a matter of law. Garring v. King Cole Northshore Hotel, Inc., Fla.App.1960, 122 So.2d 207; Brant v. Van Zandt, Fla.1954, 77 So.2d 858. The rule applicable to driving motor vehicles (dangerous instrumentalities) is strict. A motorist backing when he cannot see behind him and no one is present to tell him what is there is guilty of contributory negligence. Carson v. City of Wichita, Kans., 1938, 148 Kan. 215, 80 P. 2d 1114. But the motorist in Carson was in a strange locale, with insufficient lights, and he failed to take sufficient precautions to assure that he could safely back. Where a driver's vision is obscured, he has a duty to exercise care under the circumstances and to stop if necessary. Cruse v. Wilson, Fla.1957, 92 So.2d 270; Petroleum Carrier Corp. v. Robbins, Fla., 52 So.2d 666; Mathers v. Botsford, 86 Fla. 40, 97 So. 282, 32 A.L.R. 881.

There is nothing in the instant case comparable to factors such as dense smoke obscuring the vision of the driver,

---

**2.** Prosser suggests: "Contributory fault" as a more descriptive form, because the

element of duty to another need not be present. Prosser, Torts § 51 (2d ed.).

as in Cruse, supra. We find nothing to show that Walker's vision was obscured in such a manner as to compel a finding of contributory negligence. Backing a vehicle is not in and of itself negligent, even at night; it must be measured in view of all the circumstances. See Annotation 63 A.L.R.2d 5, 17; Green v. Atlantic Co., Fla.1952, 61 So.2d 185; City of Williston v. Cribbs, Fla.1955, 82 So.2d 150; Weis-Patterson Lumber Co. v. King, Fla.1937, 131 Fla. 342, 177 So. 313.

■ Walker was not driving on a black night in disregard of darkness. It was a clear, moonlit night. Floodlights on the silos three hundred feet away added further illumination. The truck had trailer lights on the rear and rear-view mirrors on both sides of the cab. He had driven the road several times before. He knew that the area over which he had to back up was straight and level. He knew that the road was hard-surfaced rock. He did not know that the road had slippery muck on it. He did not know that the road would not support his truck in turning around. We find that the court properly submitted the question of contributory negligence to the jury.

■ Contributory negligence alone does not bar recovery; the negligence must be a proximate cause of the accident. Bessett v. Hackett, Fla.1953, 66 So.2d 694; Kuhn v. Telford, Fla.App. 1959, 115 So.2d 36, 40. The trial judge instructed the jury: "If you find that the defendant company was negligent, but if you also find that Ernest Walker was also negligent, and if you find that the negligence of Ernest Walker, if any, was the direct, proximate, and efficient cause of his death, then you may not return a verdict in favor of the plaintiff, and your verdict should be for the defendant.

"Proximate cause is what leads to and might be expected directly to produce the damage; that is, such a cause as naturally suggests itself to the mind of a prudent man as likely to cause the accident which produces the damage."

The record contains abundant evidence —at least for the case to go to the jury— that the cave-in of the road or the combination of the slippery muck and the cave-in caused the accident. If so, the time of day had nothing to do with the accident: the road would have caved in when the truck backed up regardless of whether it was day or night.

We have considered all of the appellant's contentions, whether discussed in this opinion or not. The judgment is

Affirmed.